UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ALABAMA

In Re

CELLO ENERGY, LLC                              Case No. 10-04877-MAM-11

BOYKIN TRUST, LLC                              Case No. 10-04931-MAM-11

JACK BOYKIN                                    Case No. 10-04930-MAM-11

                Debtors

**ORDER GRANTING CONFIRMATION OF DEBTORS' CURRENT PLAN OF
REORGANIZATION WITH CONDITIONS AND RULING ON RELATED MATTERS**

C. Michael Smith and Suzanne Paul, Attorneys for the Debtors Boykin Trust, LLC and Jack
Boykin, Mobile, Alabama
Marcus E. McDowell, Attorney for Debtor Cello Energy, LLC, Bay Minette, Alabama
Jeremy L. Retherford, W. Joseph McCorkle, John Leach, Attorneys for Parsons & Whittemore
Enterprises Corporation, Montgomery, Alabama and Mobile, Alabama
Eric J. Breithaupt, Attorney for the Committee of Unsecured Creditors, Birmingham, Alabama
Richard M. Gaal, Attorney for BioFuels Operating Company, LLC and BioFuels Bay Minette
Operating Company, LLC, Mobile, Alabama


        Cello Energy filed a chapter 11 bankruptcy case on October 19, 2010.   Boykin Trust and

Jack Boykin filed chapter 11 bankruptcy cases on October 22, 2010.   The cases were

administratively consolidated on December 3, 2010 so that all hearings and actions in each case

were noticed in the other cases and matters were handled, when appropriate, in a joint way.   The

cases are before the court on the confirmation hearing on the joint plan the debtors proposed, as

well as hearings on several adversary proceedings that relate to confirmation issues and hearings

on motions to dismiss or convert some of the cases as well.

        Cello Energy is a company that owns technology it developed that it claims details a

process to turn cellulosic materials into fuel (the "technology").   Cello is owned by Boykin

Trust.  Jack Boykin was the sole owner of Boykin Trust.  Jack died on August 25, 2011 and his

estate is being probated.   There is a dispute about whether the process that Cello has, can, or will

1

ever work.  The testimony of B.e. Energy executives, including a skilled engineer, indicated a high degree of expectation on their part that the technology can work.  If the process does work, the technology is very valuable.  If it does not, the value of Cello is essentially limited to the value of a plant built in Bay Minette, Alabama to manufacture the fuel.  The plant is shuttered at this time due to failure to produce commercial quantities of any such fuel and lack of funds to keep the plant open.

Cello Energy received $2.5 million from Parsons & Whittemore Enterprises Corporation ("P&W") in April 2007.  That sum was paid by P&W for an option to buy 33% of Cello within 3 months of Cello passing ASTM tests for the production of fuel oils and gasoline with its technology (the "Option Contract").  On May 26, 2007, Cello entered into a Letter of Understanding with Khosla Ventures Company and then, on September 12, 2007, contracted with a subsidiary of Khosla, BioFuels Operating Company, LLC ("BioFuels").  The September agreement, the Manufacturing and Finance Contract ("MFC"), was meant to legally work around the P&W Option Contract and provided Cello with $12.5 million to build and make operational the Bay Minette plant.  The plant was built and turned over to BioFuels to operate it.  Several days later, BioFuels returned possession of the plant to Cello because BioFuels determined the plant was not yet ready for commercial production.  Both P&W and BioFuel's contributions to Cello were unsecured.

There were several other entities that provided secured financing for the plant.  They were: Brendle Sprinkler Company, BioFuels Operating Company, and Ted Kennedy.  BioFuels provided its secured financing when it was determined that more money was needed to complete the plant, beyond the $12.5 million it had already paid.  All of these parties have a security interest in the plant and equipment.  BioFuels and Ted Kennedy also have a secured position in the technology.

2

As soon as the BioFuels' MFC was signed, P&W, Cello and BioFuels became embroiled in litigation over whether the Biofuels' agreement violated P&W's Option Contract with Cello. In September 2010, after litigation in U.S. District Court, including a jury trial on some issues, a judgment was awarded to P&W against Jack Boykin, Boykin Trust and Cello Energy and Allen Boykin, son of Jack Boykin, in the amount of $2,827,123.00. An additional $7.5 million was awarded in punitive damages against all of the debtors and also Allen Boykin. Allen Boykin is currently the President of Cello. No damages were awarded against BioFuels and BioFuels and P&W finally resolved all of their issues after the trial. Cello and the other debtors filed their Chapter 11 cases before the appeal period for the judgment expired. The judgment remains stayed. The debtors intend to appeal the judgment as part of their plan.

P&W commenced a second suit against Lois Boykin, wife of Jack Boykin, and Allen Boykin, and others, alleging that they received fraudulent transfers of funds given to Cello for use in the business. P&W sought to pierce the corporate veil in that action as well. On February 3, 2011, the U.S. District Court ruled that Lois Boykin and Allen Boykin did receive fraudulent transfers. The Court ordered a judgment against Lois Boykin and Allen Boykin for $10,431,560.50. Allen Boykin was also adjudged liable for $40,000 and $655,000 in transfers. The judgment was in favor of P&W, it is arguable that similar claims might be an asset of Boykin Trust itself. There was not a determination of any court as to whether the judgment was properly one on which P&W could recover or whether the claims were really assets of the Boykin Trust estate (or any other of the debtor estates) that had to be used for the benefit of all creditors of Boykin Trust or the consolidated debtor entities. Lois Boykin filed for Chapter 11 bankruptcy relief on September 23, 2011. To date, Allen Boykin has not filed an individual bankruptcy petition. The judgment represents a right by P&W to collect money given to the debtors but transferred to Lois and Allen. The judgment is for sums that would otherwise be

3

assets in the debtors' estates. Any recovery on the judgment would reduce the amount owed to P&W on the Cello judgment and/or be paid to other creditors.

P&W has also filed a suit against Jack Boykin in his individual Chapter 11 case seeking to have its debt against him declared nondischargeable due to fraud and willful and malicious injury. The Disclosure Statement and his bankruptcy schedules show limited assets.

P&W filed a suit against BioFuels asking the court to determine the validity, priority and extent of BioFuels claim and to declare that the debt to BioFuels is actually an equity interest. The Creditors' Committee had filed a similar suit earlier in the case as well.

The debtors and the Creditors' Committee for Cello jointly proposed a plan (the "Current plan"). The Current plan substantively consolidates all 3 debtors into one entity. The debtors state that all proposed classes of creditors in the Current plan are impaired. All creditors voted for the Current plan except the Alabama Department of Revenue, which did not vote at all, and P&W which rejected the plan. P&W also objected to the plan. The Current plan is the fourth amended plan proposed in these cases. It aims to cure deficiencies detailed by this Court in rejecting the third amended plan. *See In re Cello Energy, LLC*, 2012 WL 245972 (Bankr. S.D. Ala. January 25, 2012).

The Current plan proposes to sell all of Cello's assets to B.e. Energy for $6 million, including the Bay Minette plant and the technology. An Asset Purchase Agreement ("APA") has been entered into between B.e. Energy and Cello, contingent on approval of the Current plan. The sale will occur, if at all, 90 days after confirmation of the Current plan. B.e. Energy is a legal entity created in March of 2011 that is currently operating out of its founding member's home in Ontario, Canada. B.e. Energy's stated business plan is to purchase developing technologies and resell them. B.e. Energy created an Alabama subsidiary, B.e. Energy Alabama, LLC, to consummate the purchase of Cello's assets.

4

The creditor classifications in the Current plan are designated as follows:

Class One: Secured Claim of Brendle Sprinkler Company, Inc., in the approximate amount of $300,849.00.

Class Two: Secured Claim of Biofuels Operating Company, LLC in the approximate amount of $1,168,214.50.

Class Three: Secured Claim of Ted Kennedy in the approximate amount of $2,411,852.89.

Class Four: Secured Claim of the Alabama Department of Revenue in the approximate amount of $15,047.12

Class Five: Unsecured Claim of Parsons & Whittemore Enterprises Corporation in the approximate amount of $10,431,560.00.

Class Six: General Unsecured Claims.

Class Seven: Unsecured Rejection and Deficiency Claims the amount of which are undetermined.

Class Eight: Equity interest of Boykin Trust, LLC.

Class Nine: Equity Interest in Boykin Trust, LLC of Jack Boykin.

The Current plan proposes to pay the secured claims, Classes One through Four, in full at the closing of the sale of the plant from the $6 million proceeds. In addition, the Current plan proposes to pay all administrative claims, tax priority claims, and a $500,000 "pot" that Class Six creditors will share pro rata in exchange for capping any future claims they might have against the estate. Class Six includes roughly $1,807,636.83 in claims and includes over 30 unsecured creditor claimants.

Class Eight and Class Nine will retain their interests in Cello and Boykin Trust respectively but "will receive no payments or distributions until and unless the creditors in Senior Classes have been paid in full."

P&W's unsecured claim of $10,431,560, which is the product of a pre-petition judgment against Cello, is dealt with separately in Class Five. The debtors dispute the amount of the

5

judgment and the Current plan proposes to devote $250,000 from the sale of the plant to fund an appeal of the judgment. No timetable for the filing of the appeal is proposed in the Current plan. P&W's allowed claim will be satisfied with the Class Seven claims pro rata from any excess funds from the sale of the plant and from any funds paid by B.e. Energy or any other entity for licensing fees for the use of the debtors' technology rights. P&W, as the Class Five claimant, can also recover from "any funds which may be collected from Allen Boykin and/or Lois Boykin pursuant to the fraudulent transfer judgment." Funds to be distributed to P&W will be escrowed during the pendency of the appeal. Payments to P&W will be paid until its allowed claim is paid in full.

Class Seven is primarily composed of BioFuels' unsecured claim of $14,583,740.35. According to the Current plan, the basis of the claim is rejection damages from pre-petition executory contracts with the debtors. The debtors did not assume any executory contracts under the Current plan. Class Seven is also composed of "the unsecured portion, if any, of the secured claims remaining after disbursement of the sale proceeds of the…plant." In fact, it appears that the $6 million sales price for the plant will pay all other secured claims in full so that BioFuels will be the only claim in the class. Class Seven will receive disbursements pro rata with Class Five from (1) any funds remaining from the sale of the plant after payment of the secured, administrative, tax priority, Class Six $500,000 pot claims, and the payment of monies to fund the appeal of the P&W judgment and (2) from any licensing fees which may be received by the debtors. These payments will continue until Class Seven claims are paid in full.

The debtors have a pending adversary proceeding against BioFuels seeking to recharacterize BioFuels' claim as equity. The Current plan releases all claims by the debtors and the Creditors' Committee against BioFuels upon confirmation. The debtors chose not to object to BioFuels' unsecured claim and propose to pay the entire claim through the Current plan. The

6

debtors' decision was based in part on BioFuels support of the Current plan, its willingness to be paid later, the complexity and cost involved with litigating BioFuels' claim and the uncertainty of any favorable outcome to the litigation. The debtors testified that they had no money to pursue a lengthy and uncertain proceeding against BioFuels. P&W filed an objection to BioFuels' claim and argued that it was based in equity rather than debt.

B.e. Energy is composed of the following members: Greg Bowman (Founder and President), Donald Guilian (Vice President and Chief Development Officer), Lawrence Bloom, Nicholas Pilgrim, and Tim Williams. It currently has no employees. Bowman has a background in the alternative energy field. He formerly owned an alternative energy company, Pure-Tek Inc., and was on the Intergovernmental Renewable Energy Organization at the United Nations. He testified that he has been retained as a consultant many times in multiple countries regarding alternative energy issues. Don Guilian is a chemical engineer who attained his degree from Auburn University in 1955. He has extensive experience as an engineer and has worked with alternative energy for 12 years. The remaining members of B.e. Energy contribute extensive financial, accounting, and business knowledge. B.e. Energy also utilizes an advisory board that includes prominent individuals in the alternative energy field.

Both Bowman and Guilian discovered Cello through Jack Boykin. They spoke with him many times regarding the technology and visited the Bay Minette plant a few times prior to his death. B.e. Energy decided that purchasing the Cello technology was a good business decision in September of 2011. It arrived at that conclusion after conducting due diligence which included preliminary engineering reviews, financial reviews, operation and maintenance reviews, and reliance on a report from the State of Mississippi detailing the cellulosic content of the fuel. B.e. Energy never independently tested any fuel itself. Bowman testified that B.e. Energy was aware of the judgment against Cello regarding the technology. Despite that knowledge, he and Guilian

expressed "extreme confidence" in the efficacy of Cello's technology. Bowman testified that B.e. Energy has spent roughly $300,000 on the Cello project to date. Guilian explained that cellulosic fuel is the "Holy Grail" of the alternative fuel options because it has low operating and capital costs, is fast growing, and creates a carbon balance. Despite that testimony, Guilian admitted that all previous attempts to create commercial quantities of cellulosic fuel have failed.

B.e. Energy believes that if the plant can be "de-bottlenecked," it can produce commercial quantities of cellulosic fuel utilizing Cello's technology. Bowman and Guilian testified that the "bottleneck" issue prevented the plant from performing in the past and that it is common for implementation issues to arise with new technologies. They have developed a plan to "de-bottleneck" the plant by, in part, altering the way feedstocks, in this case wood chips, are utilized in the production process. In order to accomplish that goal, B.e. Energy estimates that it will require a $29 million loan, $6 million of which will be utilized to purchase the plant and the technology. The remaining funds will be used to debottleneck the plant, purchase feedstocks, test the fuel, have the fuel certified, and provide for any other necessary expenses in getting the plant up and running. Guilian testified that it could actually take up to $23 million to successfully debottleneck the plant.

B.e. Energy representatives Bowman and Guilian testified that a very interested lender is prepared to loan B.e. Energy the necessary $29 million to fund the Current plan. B.e. Energy produced a document it deemed a "Term Sheet" that detailed potential financing terms with the lender. The Term Sheet was drafted in February of 2012. Bowman admitted that the Term Sheet is in no way a commitment on behalf of the lender. To date, the lender has not conducted any due diligence regarding the loan issuance because a plan allowing for the sale of Cello's assets has yet to be confirmed. Bowman explained that a 90 day period after confirmation of the Current plan would be required for the lender to complete its due diligence. Bowman also

8

testified that if financing could not be obtained after 90 days, B.e. Energy would likely walk away from the project. The Term Sheet is the only financing related document that B.e. Energy and the debtors submitted to the Court in support of the Current plan. Bowman and Guilian also testified that other potential investors eagerly await the opportunity to invest in the technology once it is operational. It is unclear whether B.e. Energy representatives made the potential lender aware of P&W's judgment regarding the technology.

Pursuant to the Current plan and the APA, Cello would receive $6 million immediately after the closing of the $29 million loan. Thereafter, B.e. Energy would begin the process of de-bottlenecking the plant. An independent engineering, procurement, and construction firm ("EPC firm") owned by Dan Wilson, Danco Yates, will implement the debottlenecking process.

The Current plan and APA also make provision for royalties to be paid to Cello for use of the technology in future plants built by B.e. Energy. In general, those royalties would equal $5 million per plant. However, if a new plant does not meet certain fuel production benchmarks, the royalty payment would be adjusted downward. Allen Boykin and Cello would be free to take on other projects or build additional plants utilizing the technology, which is licensed back to Cello as part of a separate irrevocable License Agreement between B.e. and Cello. If Cello "enters into any agreement(s) to utilize its license of the technology with a party other than B.e. Energy, then Allen Boykin will receive a salary from Cello Energy, LLC, of no more than $120,000 per year for the performance of his duties in overseeing the construction and start-up of any such future projects." Thus, Allen will receive no income from Cello unless future projects are developed and money is actually forthcoming.

B.e. Energy has been in discussions with the Keene Industrial Development Corporation of Keene, Texas (the "Development Corporation") regarding building a new alternative energy plant that could utilize Cello's technology. To fund the construction of the new plant, B.e.

9

Energy is attempting to have the Development Corporation issue industrial revenue bonds. The Development Corporation has issued a Certificate of Resolution. The resolution contemplates a $500 million bond issuance. The resolution does not bind the Development Corporation to issue any bonds. The bond amount includes both a possible cellulosic fuel plant and a natural gas plant.

Scott Bamman, an expert in industrial revenue bonds, testified that the resolution, which he termed an "inducement resolution," was only the very beginning of a lengthy and multifaceted process that ultimately results in the issuance of bonds. Bowman echoed that testimony by stating that lots of work needed to be done before a bond issue would be imminent. In particular, if the bond issue was regarding "floating rate" bonds, as opposed to "fixed rate" bonds, a letter of credit would need to be obtained from a major bank. Bamman indicated that letters of credit usually require the party seeking the bond issuance to provide security in the form of equity. Bowman insisted that validation of the technology from an EPC firm like Danco Yates would be sufficient to attain the letter of credit. Bamman testified that he had never heard of an EPC validation serving as sufficient security for the issuance of a letter of credit. Fixed rate bonds generally do not require letters of credit. In addition, in order to have bonds issued in Texas, review and approval from the Texas Attorney General is necessary. B.e. Energy has hired bond counsel in Keene, Texas and has retained a bond underwriter. However, Guilian testified that there is some chance that the Cello technology will not be used in Keene.

Allen Boykin testified that his personal assets are very limited. He explained that he has no personal property that exceeds $3,000 in value. He admitted to a 50% interest in a home in Bay Minette, Alabama that is in his ex-wife's possession. He testified that it is encumbered by two mortgages and that any equity remaining from a sale would be split between him and his ex-wife. He explained that he currently has no income and that P&W has been garnishing any

wages he receives since November of 2010. Allen also testified that he has knowledge of Lois

Boykin's assets. Lois Boykin is Allen's mother. He testified that she owns very few assets

beyond a home located in Montrose, Alabama. Lois' bankruptcy schedules value the home at

$1,833,700. The only lien encumbering the home is P&W's judgment lien. The home is

currently slated to be auctioned on April 16, 2012 by P&W. Allen explained that Lois has no

income beyond Social Security. The Current plan provides that any amount collected by the

bankruptcy estate from Allen Boykin or Lois Boykin would go to P&W to the extent a balance

remained in P&W's allowed claim.

The third amended plan proposed to have Cello pay salaries to Allen Boykin, Wayne

Phillips (Cello's engineer), and one other employee of Cello. The Current plan eliminates those

payments. Instead, the Current plan provides for monies to be paid by B.e. Energy to Verde

Energy Consultants, LLC ("Verde Consulting"), an entity of which Allen Boykin and Wayne

Phillips are members. B.e. Energy requires the expertise of Allen and Wayne in order to get the

Bay Minette plant up and running, and thus, they will be paid for their "know how." Dan Wilson

of Danco Yates is also a member of Verde Consulting. The payments from B.e. Energy to Verde

Consulting would be limited to the time necessary to get the plant operational. The debtors will

receive none of this money. However, any payments to Allen Boykin could be garnished by

P&W and applied to its judgment.

The debtors submitted a proposed modification to the Current plan which provides for a

nondebtor release of B.e. Energy from liability. It states the following:

> As of the Effective Date, for good and valuable
> consideration, each holder of a Claim or Interest shall be deemed
> to have conclusively, absolutely, unconditionally, irrevocably and
> forever released and discharged B.e. Energy USA, LLC and B.e.
> Energy Alabama, LLC (the Released Parties) from, and is
> permanently enjoined from, asserting any and all claims, Interests,
> obligations, rights, suits, damages, Causes of Action, remedies and

liabilities, including any direct Claims and derivative Claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law , equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively) based on or relating to, or in any manner arising from, in whole or in part, pre- or post-petition transactions with the Debtor, the Debtors' Plan of Reorganization, the Bankruptcy Case, the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and the Released Parties, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, any related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or fraud. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party under the Plan or any document instrument or agreement executed to implement the Plan. The Court and the Debtor shall retain the right to enforce the Asset Purchase Agreement and the Licensing agreement between the Debtor and the Released Parties.

Bowman testified that this provision was primarily included to avoid legal entanglement with P&W. No party objected to the inclusion of the nondebtor release provision.

The Bankruptcy Administrator ("BA") assigned to the present case requested that, in the event the Current plan is confirmed, Allen Boykin be removed as acting President and representative of Cello and that Verde Consulting be inserted in his place. Further, the BA requested that strict timelines for implementation of the Current plan be ordered by the Court followed by a timely dismissal in the event the plan fails. The BA also indicated support for the Current plan as the best option to get money for a majority of the creditors in the case.

LAW

1.

The plan proponents, the debtors and the Creditors' Committee, bear the burden of proving the confirmability of their plan by a preponderance of the evidence. *Heartland Federal Savings & Loan Ass'n v. Briscoe Enterprises, Ltd. (In re Briscoe Enterprises, Ltd.)*, 994 F.2d 1160 (5th Cir. 1993); *In re Richfield 81 Partners II, LLC,* 447 B.R. 653 (Bankr. N.D. Ga. 2011); *In re BBL Group, Inc.*, 205 B.R. 625 (Bankr. N.D. Ala. 1996). To meet that burden, they must show that the plan fulfills the requirements of 11 U.S.C. § 1129. *In re Lett*, 632 F.3d 1216 (11th Cir. 2011). The Court carefully observed all of the witnesses and judged their credibility.

The ballots show that all creditor classes accepted the plan except P&W and the Alabama Department of Revenue. The State of Alabama did not vote against the plan; it just did not vote. P&W did vote against the plan. P&W also objected to the plan.

P&W objected to the plan on the bases that

    A. P&W opposes the Plan's treatment of the BioFuels Claim. The contract on which the BioFuels Claim is based is not an executory contract to which BioFuels is entitled to rejection damages. Even if the Court concludes that the contract is executory, BioFuels improperly calculates its rejection damages and further, the BioFuels Claim is due to be recharacterized as equity.

    B. P&W opposes the joint consolidation of the Debtors' three bankruptcy cases and reasserts its motion to dismiss the Boykin Trust bankruptcy case. Cello has a number of significant creditors, of which P&W is one. On the other hand, Boykin Trust has only one significant creditor—P&W. It is inequitable for the assets of Boykin Trust to be used to satisfy the claims against Cello.

    C. The Plan allows too much time for the Debtors to market the Bay Minette Plant.

    D. The Technology does not work and is a fraud. The Bankruptcy Court should not confirm a plan allowing further fraud through the use of the alleged Technology.

    E. The Plan is not feasible.

    F. The Plan blatantly gerrymanders classes.

G. The Plan violates the absolute priority rule.

H. P&W opposes the Plan's treatment of P&W's claim. Despite being a general unsecured claim, the Plan does not allow P&W's claim to share in the pro rata distribution of the proceeds resulting from the sale of the Bay Minette Plant.

I. P&W opposes the Plan to the extent it seeks to enjoin or otherwise restrict P&W's ability to pursue rights and remedies against other non-debtors who are indebted to P&W for claims related to those owed to it by Cello and Boykin Trust.

J. P&W opposes the release by Cello of valuable indemnity claims against BioFuels that, if pursued, should result in a significant increase in distributable assets.

(Objection of P&W to Third Amended Joint Plan of Reorganization, pp. 1-2). P&W incorporated its objections to the third amended plan into its objection to the Current Plan. The Current plan has at least one accepting impaired class, Classes Two and Seven of Biofuels, and Class Six, General Unsecured Claims, so the Current plan meets the requirement of 11 U.S.C. § 1129(10) and can proceed to a confirmation hearing.

As to P&W, the debtors must prove they can confirm the plan over P&W's objection and dissenting class vote. Since P&W is in a separate class and voted against the plan, the requirements of 11 U.S.C. § 1129(b)(1) and (b)(2) must also be met as to its claim.

Although the State of Alabama Department of Revenue did not object, its class did not accept the Current plan so the debtors must also prove that they satisfy the requirements for confirmation as to its claim (which is a separate class, Class Four). The Court will deal with each of the objections or other issues in turn.

A.

The Current plan must meet the requirements of 11 U.S.C. § 1129(a) to be confirmable. The debtors provided testimony as to each of the 15 sections of 1129(a) that are applicable. The evidence was credible and sufficient. P&W does not object on grounds under 1129(a)(1)-(7)

14

(a)(9), (a)(11)-(a)(15). Although not voting, the treatment of the Alabama Department of Revenue claim must satisfy the requirements of 1129(b) since the State has a secured tax lien. Therefore, without further discussion, the court finds that the Current plan satisfies the requirements of 11 U.S.C. § 1129(a)(1), (a)(2), (a)(3), (a)(4), (a)(5), (a)(7), and (a)(12). Sections (a)(6), (a)(9), (a)(13), (a)(14), and (a)(15) do not apply to the debtors or their cases. Section (a)(8) provides that all classes have accepted the Current plan or are not impaired by it. That requirement is not met as stated above because P&W and the State of Alabama did not accept the Current plan and P&W's claim is impaired by it. However, this is not a fatal failure. Section (a)(10) allows a plan to be confirmed without acceptance by all classes if at least one class of claims accepts the plan and the plan provides for the nonconsenting classes as required by 11 U.S.C. § 1129(b).

The objections of P&W and the State of Alabama require the Court to discuss 11 U.S.C. § 1129(a)(11) and (b) separately. The other requirements have been met.

## B.

The State of Alabama has a secured claim for $15,047.12 according to the Current plan. The debt is secured by a statutory tax lien against the plant owned by Cello. The debtors propose to pay this claim in full at the closing of the sale of the plant. Because the claim is secured, it is not a priority claim under 11 U.S.C. § 1129(a)(9) and the plan does not need to meet the requirements of that section. However, since the plan proposes to sell the Bay Minette plan in a time frame much shorter than the 5 year period over which priority claims treated under the section must be paid, the plan does comply with the section.

As a secured claim, under 11 U.S.C. § 1129(b)(1), the plan must allow the holder of the claim to retain its lien and pay the holder a value equal to the allowed amount of its claim. The plan does this. Alabama will be paid in full with interest as soon as the plant is sold. The sale

15

proposed in the plan will be at a price which will allow full payment. Therefore, the plan is confirmable as to the State of Alabama, regardless of whether it voted or not.

C.

**P&W opposes the Plan's treatment of the BioFuels Claim. The contract on which the BioFuels Claim is based is not an executory contract to which BioFuels is entitled to rejection damages. Even if the Court concludes that the contract is executory, BioFuels improperly calculates its rejection damages and further, the BioFuels Claim is due to be recharacterized as equity.**

P&W objects to the treatment of BioFuels unsecured claim of $14,583,740.35 in Class Seven of the plan.[1] It believes that the debtors should have objected to the claim of BioFuels and reduced or eliminated or subordinated its debt to other creditors. The debtors concluded that the claim should not be objected to and propose to pay the entire claim in the plan. The claim is large, larger than P&W's $10,431,560 claim. This means that BioFuels, if the plan is confirmed, will receive pro rata distributions from the debtor that will be larger than P&W's when, and if, money is received from B.e. Energy or other sources.

Class Seven is essentially a class consisting of only BioFuels' claim. The plan says that it includes any deficiency claims resulting from sale of the Bay Minette plant at a price less than an amount that would pay those claims in full. The sale of the plant to B.e. Energy will pay all secured creditors in full so that BioFuels is the only class member.

11 U.S.C. § 1123(b)(3)(A) provides that a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." The debtors did not leave open for later objection or adjudication any issue as to BioFuels' claim and are agreeing that the filed unsecured claim of BioFuels should be allowed as filed. The debtors did not assume any executory contracts under the Current plan. A bankruptcy court can allow a

---

[1] BioFuels also has a secured claim, Class 2, which is not at issue.

compromise of a claim in a plan if it is "fair and equitable" to the estate. *In re Arden*, 176 F.3d

1226, 1228 (9th Cir. 1999). As with any compromise, the court must examine the following

factors:

> (a) The probability of success in the litigation;
> (b) The difficulties, if any, to be encountered in the matter of collection;
> (c) The complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and
> (d) The paramount interest of the creditors and a proper deference to their reasonable views.

*Arden*, 176 F.3d at 1228.

The fact that BioFuels and P&W filed voluminous pleadings in regard to BioFuels' claim in the

plan litigation and P&W has filed an objection to BioFuels' claim shows the complicated and

uncertain nature of any litigation over the claim. P&W also offered testimony, live and by

deposition excerpt, about why it believes the unsecured claim of BioFuels is really an equity

investment by BioFuels. BioFuels countered with similar evidence showing why the claim is not

equity. The parties also offered evidence as to the indemnity rights, or lack thereof, of the

debtors from BioFuels. The court does not need to decide who is correct on the law and facts to

determine that a compromise is proper. The court must only decide that reasonable minds could

differ as to the outcome and that the issues are serious. With the evidence offered, the prong of

"probability of success" is met. The debtors are as likely right about BioFuels claim as P&W is.

There was no evidence offered that it would be difficult to collect any judgment from BioFuels.

However, the issue is not one of collection in this case. BioFuels has a claim and any judgment

would merely reduce the size of the claim, not result in adding funds to the estate. The

"difficulty of collection" factor is not relevant to this case.

As the voluminous evidence shows, the issue is complex. To hear just what issues are

involved took an extensive amount of time. To actually try the case would take at least several

days or more.  The discovery issues would be extensive.  The debtor has no money to pursue the case.  Without a settlement with BioFuels, its ability to confirm a plan would be less likely.  BioFuels helped the debtors and Creditors' Committee present the case for confirmation of a plan.

The settlement with BioFuels was supported by the debtors and the Creditors' Committee and all of the accepting classes of creditors in the case.  Other than P&W, no one objected.  The settlement facilitates a quicker confirmation and consummation of the plan.  The objection is overruled.

D.

**P&W opposes the joint consolidation of the Debtors' three bankruptcy cases and reasserts its motion to dismiss the Boykin Trust bankruptcy case. Cello has a number of significant creditors, of which P&W is one. On the other hand, Boykin Trust has only one significant creditor—P&W. It is inequitable for the assets of Boykin Trust to be used to satisfy the claims against Cello.**

The debtors' plan consolidates all 3 cases into one entity, Cello Energy.  A plan can provide for substantive consolidation.  11 U.S.C. § 1123(a)(5)(C) states that a plan may contain a "merger or consolidation of the debtor with one or more persons."[2]  *Eastgroup Properties v. Southern Motel Ass'n, Ltd.*, 935 F.2d 245 (11th Cir. 1991).  "It involves the pooling of the assets and liabilities of two or more related entities; the liabilities of the entities involved are then satisfied from the common pool of assets created by consolidation."  *Id*. at 248.  The test to be used is whether "the economic prejudice of continued debtor separateness 'outweighs' "the economic prejudice of consolidation."  *Id*. at 249 (citing *In re Snider Bros., Inc.*, 18 B.R. 230, 234 (Bankr. D. Mass. 1982)).  The *Eastgroup* case cited to a case that listed 7 factors to consider.  *In re Vecco Construction Indus.*, 4 B.R. 407, 410 (Bankr. E.D. Va. 1980).

---

[2] A "person" in the Bankruptcy Code includes a corporation.  11 U.S.C. § 101 (41).

This case is very different from most of the cases discussed, however. Boykin Trust has no assets other than a potential fraudulent transfer action against Lois and Allen Boykin. Boykin Trust has as its only creditor P&W. P&W holds a judgment against it for $10,431,560.50. That judgment is the same judgment it holds against Cello and Jack Boykin. P&W also holds a fraudulent transfer and piercing the corporate veil judgment against Lois Boykin and Allen Boykin for the same funds of which they received a portion. That judgment is final. The Trust did not pursue and does not intend to pursue any potential cause of action against Lois or Allen Boykin. The Current plan states that the debtors do not believe that the judgment has any value to the estate for payment to other creditors beyond P&W. As the only creditor of Boykin Trust, P&W is free to pursue any action against Lois or Allen it may have. In fact, P&W is set to sell the home of Lois Boykin on April 16, a home she valued at $1.8 million in her schedules. Therefore, the consolidation of Boykin Trust and Cello and Jack Boykin does not prejudice P&W. The cause of action it holds (by virtue of its own judgment) is the only asset of Boykin Trust (except the Cello Energy stock) and it may pursue it as it wishes. Boykin Trust also holds the stock of Cello Energy. Since P&W is being paid in full, allowing the stock to remain in the estate does not prejudice P&W. Consolidating the debtors is appropriate for purposes of dealing with the Cello judgments and paying all creditors of all of the estates. The issue of absolute priority is discussed below. The objection is overruled.

E.

The Plan allows too much time for the Debtors to market the Bay
Minette Plant.

This objection to the third amended plan of the debtors has changed somewhat due to changes in the Current plan. In the third amended plan, the debtors intended to market the plant for 3 months prior to a sale, followed by a 2 month period to close the sale. In the Current plan,

19

the debtors allow B.e. Energy three months for due diligence and to close a transaction. The court concludes that a three month period is not too long, in light of the signed APA. Also, the court is going to require that, if the sale does not close in three months after the order confirming the plan is entered, the cases should be set for a possible dismissal.

F.

> The Technology does not work and is a fraud. The Bankruptcy Court should not confirm a plan allowing further fraud through the use of the alleged Technology.

The Court is aware that P&W does not believe that the technology can work. This Court does not know if it can work. There are parties, several of whom testified in this Court, who fervently believe it will work, given enough time, money, and know-how. The Court does not have to decide whether the technology works. If parties are willing to enter into a deal to purchase the plant and technology with full knowledge of the facts, especially that the technology is unproven, the Court sees no reason not to let such investors take their chances. The vision of new buyers will pay some or all of the claims of these estates.

G.

The Plan is not feasible.

P&W objects to the plan as unfeasible. The objection is, in part, based upon the fact that P&W does not believe the technology will work. The Court has already addressed this issue. P&W also objects based on the length of time over which it and BioFuels will be paid, the uncertainty of whether the technology will work and ever result in licensing fees, the uncertainty of whether B.e. Energy will be able to get industrial revenue bonds issued in Texas, and the unfairness of Allen Boykin being paid a salary while P&W is getting nothing.

11 U.S.C. § 1129(a)(11) states that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor

to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." The feasibility test "encompasses two interrelated determinations—(i) a finding that the debtor will be able to make all payments under and comply with the provisions of the plan, and (ii) a finding that the plan provides reasonable assurances that the debtor will remain viable for a reasonable time." *In re American Family Enterprises*, 256 B.R. 377, 404 (D. N.J. 2000). The Current plan meets both tests.

The Court concludes that B.e. Energy will provide the funds necessary to resurrect the Bay Minette plant and pay $6 million into the case within 90 days. If it does not, the case is subject to dismissal. The $6 million, paid for both the plant and the technology represents the best price presented to this Court for these assets. Without the B.e. Energy offer, the assets would be sold piecemeal at lesser values. The plant has more value when used for the purposes for which it was built than if it is sold for retrofitting. Either B.e. Energy is right that the technology has value, or, if the technology is sold separately, the Court questions what value, if any, it would have. There are no patents on the technology and the testimony revealed that most of it was "in the heads" of Allen Boykin and an engineer who worked for Cello. The Court found Mr. Guilian to be a very credible, intelligent, sincere individual who is convinced the technology will work.

The Court is confirming the plan assuming that B.e. Energy will be able to make the technology work. If it does, everyone should be paid. If it does not, the debtor has been paid $6 million for its assets which will pay virtually all of the creditors except BioFuels and P&W. If, as P&W believes, the technology is worthless, the plan will have resulted in more recovery for the creditors than would be received without the plan allowing the B.e. Energy purchase. The objection of P&W is overruled.

## H.

## The Plan blatantly gerrymanders classes.

P&W asserts that placing it in a class separate from the other unsecured creditors is improper. There are 9 separate classes; Classes Five through Seven are unsecured claims. Class Six is the unsecured claims other than BioFuels and P&W. BioFuels is in its own separate class, Class Seven; P&W is in a separate class as well, Class Five.

In order for a plan to be considered for confirmation, at least one impaired class must accept the plan. The debtors state that all of the secured claims are impaired. In fact, Classes One, Three and Four may not be impaired since they are being paid in full at contract interest until closing of any sale of the property. If the sales price for the Bay Minette plant is $6 million, their claims will be paid in full. However, 11 U.S.C. § 1124(2)(C) does state that to be unimpaired a claimant must also be paid for "any damages incurred as a result of any reasonable reliance" on a default clause or applicable law relating to a default clause. There is no statement in the plan that such damages, if any, would be paid. Therefore, the claims may be impaired. In any event, Class Two, the secured claim of BioFuels, is being paid at a set amount and is not being paid interest until closing. This claim is impaired under the definition in 11 U.S.C. § 1124. Since there is at least one impaired class, the plan is eligible for confirmation. Separate classification of P&W was not required for eligibility for confirmation under 11 U.S.C. § 1129(a)(10).

P&W also argues that if all unsecured creditors were put in one class, the class would not vote to confirm the plan. Class Six, which includes all unsecured claims except P&W and BioFuels, includes approximately $1,807,636.83 in claims. Class Seven, the BioFuels claim, is approximately $14,583,470.35. Class Five, the P&W claim is approximately $10,431,560. These claims total $26,822,667.18. 11 U.S.C. § 1126(c) states that a class of claims has

accepted a plan if at least one-half of the claims voting to accept the plan and two-thirds of the amount of the claims vote to accept the plan. If the three classes were lumped together, P&W holds over one-third in amount of the claims of the class, so the class would not be an accepting class.

For this reason, P&W's claim must be able to be separately classified, or, the Court must determine that the plan could be confirmed over a rejecting vote by the unsecured creditor class. 11 U.S.C. § 1122(a) states that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." This is the only section of the Bankruptcy Code that specifically addresses classification. Clearly, this plan meets this test. However, case law has further refined the law as to separate classification where such classification would affect the votes of a class.

As a backdrop, it is clear that the proponent of a plan "has considerable discretion to classify claims and interests according to the facts and circumstances of the case." *Olympia & York Florida Equity Corp. v. Bank of New York (In re Holywell Corp.)*, 913 F.2d 873, 880 (11th Cir. 1990). Cases have used different tests to determine when separate classes are appropriate. Many courts use the four factor test found in *In re Tucson Props. Corp.*, 193 B.R. 292 (Bankr. D. Ariz.1995). The four factors are (1) Is the discrimination reasonably based? (2) Can the debtor reorganize without the separate classification? (3) Is the discrimination fair and proposed in good faith, or is it only necessary to create an impaired consenting class? and (4) Is the degree of discrimination directly related to the rationale for the disparate treatment? *Id.* at 301. Other courts have looked at whether the discrimination served any "legitimate business purpose." *In re Chateaugay Corp.*, 89 F.3d 942 (2nd Cir. 1996).

This case is different than any case this Court has found which has looked at this issue. P&W has a very unique position as a creditor. P&W is an unsecured creditor of the three

debtors.  P&W has a judgment against the debtors that is not final.  The debtors dispute the validity of the debt, in whole or part.  Most importantly, P&W has a final judgment against Lois Boykin and Allen Boykin for essentially the same amounts owed on the judgment against the debtors.  In fact, P&W is pursuing collection from Lois and Allen and has received funds from Allen by garnishment and will shortly sell the home of Lois Boykin which Ms. Boykin valued in her bankruptcy schedules at $1.8 million. P&W will also be able to garnish any funds Allen Boykin receives from B.e. Energy.  P&W has the ability to collect at least some of its judgment before any of the other creditors receive anything from the debtors and to continue collecting even if the other creditors' claims are capped by their treatment (as Class Six is) or discharged by the failure of the plan (as Class Seven is).  The ability to collect from Lois and Allen is the result of Boykin Trust itself not pursuing a fraudulent transfer claim against the parties. The ability to create its own offset to its claim in the case is unique. This status makes its claim separately classifiable.  *In re Johnston*, 21 F.3d 323, 326 (9th Cir. 1994) (holding that separate classification of claim that is partially secured by nondebtor collateral and claim that is in litigation where claim may be offset or exceeded by debtor's claim against it is appropriate); *SPCP Group, LLC v. Biggins*, 465 B.R. 316 (M.D. Fla. 2011) (allowing separate class for one claim where claim is 100% collateralized in another case and creditor is receiving payments while other unsecured creditors have received nothing to date); *In re Multiut Corp.*, 449 B.R. 323 (Bankr. N.D. Ill. 2011) (allowing separate classification of claims that were in dispute and subject to potential setoff rights); *In re LOOP 76, LLC*, 442 B.R. 713 (Bankr. D. Ariz. 2010) (holding rights to recovery from non-debtor sources was a valid reason for separate classification in reliance on *Johnston* case).

There are cases that state that the fact that a creditor has a guarantee from a non-debtor does not make a claim unlike other unsecured claims. *In re National/Northway Ltd. Partnership,*

279 B.R. 17 (Bankr. D. Mass. 2002). These cases hold that it is the nature of the claim "as it relates to the assets of the debtor" that is the relevant consideration. *Id.* at 30. The Court is aware that the 9th Circuit Court of Appeals in *In re Barakat*, 99 F.3d 1520, 1526 (9th Cir. 1996) ruled that a mortgage deficiency claim was not unlike other unsecured claims in a case and the claim should have been placed in the same class as other unsecured claims. However, the Court further stated that the *Johnston* case was not overruled. It stated that the "special circumstances" of litigation that might result in full payment to the creditor before other creditors, the debtor's potential right to setoff, and the partial security for the claim in non-debtor property made the separate classification valid in the *Johnston* case. *Id.* The Court concludes that the claim of P&W is not substantially similar to the claim of BioFuels or the other general unsecured creditors and it can be separately classified. It is in dispute. It is already being paid and may have an ability to be paid in the future whereas the claims in Classes Six and Seven will be capped and discharged by the payments they receive in this case. The payment of the claim is from assets that are arguably also subject to a fraudulent transfer cause of action by Boykin Trust. The objection is overruled.

## I.

### The Plan violates the absolute priority rule.

P&W states that the Current plan violates 11 U.S.C. § 1129(b)(2)(B)(ii) which is called the absolute priority rule. The rule prohibits the confirmation of any plan if any of the debtor's equity holders retain any equity interest in the estate without payment of senior objecting creditors in full. The Current plan states that Class Eight (the Equity Interest of Boykin Trust, LLC in Cello Energy) and Class Nine (the Equity Interest of the Jack Boykin Estate in Boykin Trust, LLC) will retain their interests in Cello and Boykin Trust respectively but "will receive no payments or distributions until and unless the creditors in Senior Classes have been paid in full."

Current plan, p. 13, ¶ 4.8-4.9. The Current plan proposes to pay P&W in full over the life of the plan, in whatever amount is determined to be owed by a final judgment. Therefore, the retention of the equity interests is not violative of section 1129(b)(2)(B).

The plan provides that Allen Boykin will be paid a salary from Cello if it successfully markets the technology of Cello to other buyers or licensees. This does not violate the absolute priority rule. Allen is not being paid as a shareholder. He is being paid as an employee. Allen will only receive the salary if the technology can be marketed to other buyers which will necessarily mean that P&W and BioFuels are being paid as well. The payments are for his services only. The Bankruptcy Administrator objected to having Allen Boykin remain as President and representative of Cello Energy after confirmation. He asserted that Verde Consulting should be the President and representative. The Court concludes that having Verde Consulting as the operating entity and representative of Cello is not appropriate. A corporation being the CEO or president of a corporation would be unwieldy and difficult.

The real issue is whether the plan that purports to pay P&W in full is feasible. The Court concludes that it is and that issue is discussed in section G above. The objection is overruled.

J.

> P&W opposes the Plan's treatment of P&W's claim. Despite being
> a general unsecured claim, the Plan does not allow P&W's claim
> to share in the pro rata distribution of the proceeds resulting from
> the sale of the Bay Minette Plant.

11 U.S.C. § 1129(b)(1) requires that a plan "not discriminate unfairly" and be "fair and equitable" as to any objecting class. P&W asserts that the payment of $500,000 to Class Six before Class Five or Seven receive any funds discriminates unfairly against it. The $500,000 will be paid from the proceeds of the sale of the Bay Minette plant. P&W and BioFuels must wait to receive any funds until the Bay Minette plant is functioning and proves that other plants

26

can be built. The plan also provides that $250,000 of the funds from the sale of the plant will be used for appeal of the P&W judgment.

If the $500,000 were paid pro rata to Classes Five-Seven, the recovery would be .0186%. P&W's share would be $194,027. As the plan is now proposed, the Class Six unsecured creditors will receive about 27.6% of their claims. Classes Five and Seven will potentially receive 100% of their claims, but at a later date, if and when a licensing fee is paid to Cello for new plants. If a $5,000,000 licensing fee for one plant was received, Classes Five and Seven would be paid about 20% of their claims. Each additional fee would pay an additional 20%. The $250,000 appeal fund would pay .009% of the total unsecured claims and pay approximately $93,884 of P&W's claim. More importantly, these funds put the claim of P&W in question and allow the debtors to withhold any payment to P&W until the appeal is concluded.

Conversely, if Class Six claimants did not agree to compromise and cap their claims, P&W and BioFuels would be diluted by another $1,307,636 in claims. These claims would need to be paid pro rata with Classes Five and Seven.

A plan unfairly discriminates "when it treats similarly situated classes differently without a reasonable basis for the disparate treatment." *In re Young Broadcasting Inc.*, 430 B.R. 99, 139-40 (Bankr. S.D.N.Y. 2010); *In re Johns-Manville*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986). "The pertinent inquiry is not whether the plan discriminates, but whether the proposed discrimination is 'unfair.'" *In re Unbreakable Nation Co.*, 437 B.R. 189, 202 (Bankr. E.D. Pa. 2010) (quoting *In re Armstrong World, Inc.*, 348 B.R. 111, 121 (D. Del. 2006). The discrimination (1) must have a reasonable basis; (2) must be necessary to consummate the plan; (3) must be proposed in good faith; (4) and must be in direct proportion to its rationale. *Mercury Capital Corp. v. Milford Connecticut Associates, L.P.*, 354 B.R. 1, 10 (D. Conn. 2006). In this case these tests are met. P&W is being paid after the general unsecureds because the

unsecureds are compromising their claims to receive the immediate payment and P&W is not. The compromise of the smaller general unsecured claims benefits P&W by allocating more to payment of its claim in the future. The compromise with Class Six is necessary to consummation due to administrative reasons. If the unsecured creditors in Class Six had to be paid monthly or yearly checks, there would be substantially more bookkeeping costs. The class is akin to an administrative convenience class in which numerous small creditors are paid in cash to limit overhead costs going forward. The payment to Class Six before payment to Class Five is in good faith. The creditors have agreed to a compromise of their claims at about 27% and this reduction is important to the other creditors and the overall plan. The payment in cash is directly related to the compromise and supports the plan's rationale for the immediate payment.

The $250,000 sum being held for the appeal of P&W's judgment is not an unfair discrimination question. The sum is being withheld from payment to ANY creditor in Classes Five-Seven. The Court concludes that the sum is reasonable and important to the debtors' effort to pay only what the debtors believe they owe to any creditor. It is understandable that P&W would prefer to have this payment deleted, but the debtors' rationale for the funding of the appeal is sound business judgment and the Court concludes it is appropriate. The objection is overruled.

### K.

> P&W opposes the Plan to the extent it seeks to enjoin or otherwise restrict P&W's ability to pursue rights and remedies against other non-debtors who are indebted to P&W for claims related to those owed to it by Cello and Boykin Trust.

This objection was dealt with in the Current plan. P&W is allowed to proceed against non-debtors for recovery of assets that might otherwise have been the subject of a fraudulent transfer action by Boykin Trust. As stated above, the assets recovered will affect the amount of

P&W's claim and has resulted in some payments already to P&W and, on April 16, will result in recovery of real estate valued by Lois Boykin at $1,800,000. This objection is moot or overruled.

L.

> P&W opposes the release by Cello of valuable indemnity claims against BioFuels that, if pursued, should result in a significant increase in distributable assets.

This objection relates to the issues discussed in Section C above. The debtors, in exchange for support of the plan, and due to the uncertainty, cost and delay related to litigation with BioFuels, has elected to propose a plan that allows BioFuels' claim as filed. The Court concludes that this compromise is an exercise of the debtors' business judgment that should be approved. The compromise includes the alleged indemnity claims that Cello may or may not have against BioFuels. The objection is overruled.

2.

P&W objected to the Current plan and added several new objections. These are discussed in this section. The objections are:

> The Current Plan contains no real deadline for the Debtors to dispose of their assets including the Bay Minette Facility. The Current Plan places no deadline on the time in which an appeal of the Cello I Judgment can be filed.

The objection as to a deadline to sell the Bay Minette Facility was addressed at trial. B.e. Energy will need 90 days to do its due diligence and close on the $6 million purchase of the plant. This time frame is reasonable. If the closing does not occur, the Court will set the cases for status to determine if they should be dismissed or converted. The Court agrees that a timeframe should be placed on appeal commencement. The appeal of the Cello I Judgment

29

should be commenced no later than 90 days after closing of the sale of the Bay Minette plant. The plan does not set a date but the Court will only confirm the plan if it is amended to include a deadline as stated. The objections are overruled based upon the amendment of the plan to incorporate the two deadlines.

3.

The Current plan provides for a release of all claims against B.e. Energy as submitted in a proposed modification to the Current plan. B.e. Energy's President testified that it was seeking the release since P&W sued BioFuels in regard to its investment in Cello Energy and it wants to be assured that it is not buying a lawsuit by proposing to purchase the plant and technology. No one objected to the nondebtor release. However, specific findings supporting a nondebtor release are required for it to be allowed.

A bankruptcy court has been allowed to approve nondebtor releases in cases in the Second, Fourth, Sixth, and Seventh Circuits. *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2nd Cir. 2005); *In re Dow Corning Corp.*, 280 F.3d 648 (6th Cir. 2002*); In re A.H. Robins Co., Inc.*, 880 F.2d 694 (4th Cir. 1989); *Matter of Specialty Equipment Companies, Inc.*, 3 F.3d 1043, 1047 (7th Cir. 1993) ("a per se rule disfavoring all releases in a reorganization plan would be . . . unwarranted"). The Fifth, Ninth and Tenth Circuits do not allow third party releases. *In re Pacific Lumber Co.*, 584 F.3d 229, 257 (5th Cir. 2009); *In re Lowenschuss*, 67 F.3d 1394 (9th Cir. 1995); *In re Western Real Estate Fund, Inc.*, 922 F.2d 592 (10th Cir. 1990*), opinion modified*, 932 F.2d 898 (10th Cir. 1991). The Eleventh Circuit has not addressed this issue. Most courts that allow releases have stated that nondebtor releases should only be granted "cautiously and infrequently." *Behrmann v. National Heritage Foundation*, 663 F.3d 704, 712

30

(4th Cir. 2011).  Several reported cases of lower courts in the Eleventh Circuit have confirmed

plans with nondebtor releases.  *E.g.*, *In re Mercedes Homes, Inc.,* 431 B.R. 869 (Bankr. S.D. Fla.

2009); *In re Transit Group, Inc.*, 286 B.R. 811 (Bankr. M.D. Fla. 2002).

> The factors to be considered in approving a nondebtor release are:

> > (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and; (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

*Behrmann*, 663 F.3d at 711-12.

In this case, there is not an indemnity agreement between the debtor and B.e. Energy; however, a

suit against B.e. Energy will deplete assets of the estate because B.e. will not enter into the APA

without the release. Also, pursuant to the APA, B.e. Energy is assuming (1) all obligations with

respect to the plant arising on or after the Closing, (2) all obligations under outstanding customer

purchase orders, and (3) all leases of personal property and equipment, and contracts or

agreements with vendors providing services after Closing. The nondebtor is contributing $6

million to the estate at least and will contribute more if the technology works.  Without the

injunction, B.e. Energy will not enter into the Asset Purchase Agreement and Licensing

Agreement. The sale hinges on B.e. Energy not being sued by P&W. However, P&W, the class that is being directly impacted by the release has not voted to accept the plan. This is required by factor 4. The plan does propose to pay P&W in full. Because P&W has not voted to accept the plan, all seven of the factors required for a release have not been met. Therefore, although the Court understands why B.e. Energy wants a release, the Court cannot grant one.

B.e. Energy is protected by this Court's order of confirmation of the Current plan, however. The order authorizes the debtors to enter into the APA and Licensing Agreement upon the terms stated. This offers protection to B.e. Energy if it acts in accordance with the terms of the Agreement. The Court hopes this is sufficient inducement for B.e. Energy to enter into the agreement.

## 4.

In the bankruptcy cases of the debtors, there are numerous pending motions that are affected by this order. Many of the motions were filed as alternatives to confirmation or to facilitate confirmation. The court is denying or mooting the motions.

The debtors, Creditors' Committee and/or P&W have also filed several adversary proceedings that are also affected by this order. They are dealt with below.

IT IS ORDERED that

1. The Fourth Amended Plan of the Debtors is CONFIRMED upon the condition that it is amended to provide that any appeal of the Parsons &Whittemore Corporation judgment against the debtors be appealed no later than 90 days after the closing of the Asset Purchase Agreement with B.e. Energy, and the plan is amended to provide that no non-debtor release is provided to B.e. Energy.

2. The motion for relief from stay of Brendle Sprinkler Company, Inc., (Docket No. 35) is DENIED;

3. The objection by the debtors to Parsons & Whittemore Enterprises Corporation 's Claim No. 8 (Docket No. 96) is OVERRULED as moot due to the fact that the plan provides the claim amount will be resolved on appeal of the Parsons &Whittemore Enterprises Corporation judgment against Cello Energy, et al.;

4. The motion for relief from stay of Parsons & Whittemore Enterprises Corporation (Docket No. 156) is DENIED;

5. The joint motion to continue the hearing on the objection to Parsons & Whittemore Enterprises Corporation's claim (Docket No. 187) is denied as MOOT;

6. The motion of the Official Committee of Unsecured Creditors to continue the hearing on its plan (Docket No. 271) is denied as MOOT;

7. The motion of Parsons & Whittemore Enterprises Corporation to convert the cases from chapter 11 to chapter 7 cases (Docket No. 289) is denied as MOOT;

8. The motion of BioFuels Operating Company, LLC, to extend the time to file a complaint objecting to discharge or dischargeability of debts of the debtors (Docket No. 306) is denied as MOOT;

9. The motion of Cello Energy, LLC, to expedite the hearing on the Debtors' Third Amended Plan of Reorganization (Docket No. 351) is DENIED;

10. The motions of Parsons & Whittemore Enterprises Corporation to dismiss the cases of Cello Energy, LLC, Jack Boykin and Boykin Trust (Docket No.s 438, 439, and 440 respectively) are DENIED;

11. The motion of Parsons &Whittemore Enterprises Corporation to withdraw its motion to convert the case of Cello Energy, LLC to a case under chapter 7 (Docket No. 441) is DENIED;

12. In the case of Cello Energy, LLC, Boykin Trust, LLC and Jack W. Boykin v. Parsons & Whittemore Enterprises Corporation, Adv. Case No. 11-00031, the case is DISMISSED without prejudice;

13. The case of the Official Committee of Unsecured Creditors of Cello Energy, LLC v. Parsons &Whittemore Enterprises Corporation , Adv. Case No. 11-00198, the case is DISMISSED without prejudice;

14. The case of Cello Energy, LLC, Boykin Trust, LLC and Jack W. Boykin v. BioFuels Operating Company, LLC, Adv. Case No. 11-00199, is DISMISSED without prejudice;

15. The case of Parsons & Whittemore Enterprises Corporation v. BioFuels Operating Company, LLC and BioFuels Bay Minette Operating Company, LLC , Adv. Case No. 11-00217, is DISMISSED without prejudice; and

16. In the event a closing of the Asset Purchase Agreement of the Debtors with B.e Energy does not occur within 90 days of the date of this order, these cases, upon motion of any party, will be set for a hearing on whether the cases should be dismissed or converted or other appropriate action taken.

Dated:   April 10, 2012

MARGARET A. MAHONEY
CHIEF U.S. BANKRUPTCY JUDGE